**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | ) | |
| CONSUMER FINANCIAL PROTECTION | ) | |
| BUREAU | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.: 2:21-cv-2664 |
| | ) | |
| v. | ) | JURY DEMAND |
| | ) | |
| TRUSTMARK NATIONAL BANK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

### INTRODUCTION

1. Plaintiffs the United States of America and the Consumer Financial Protection Bureau ("Bureau") bring this action against Trustmark National Bank ("Trustmark" or the "Bank") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, and the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. § 5536(a)(1)(A).  Plaintiffs allege that Trustmark engaged in a pattern or practice of unlawful redlining by structuring its business and outreach efforts so as to avoid the credit needs of majority-Black and Hispanic neighborhoods in its residential mortgage lending, and thereby engaging in acts or practices directed at prospective applicants that discouraged those residing in, or seeking credit for properties located in, these neighborhoods from applying for credit.

2. The FHA and ECOA prohibit creditors, such as banks, from discriminating in home loans on the basis of race, color, national origin, and other characteristics.  Under the FHA, it is unlawful to discriminate against any person in making available residential real estate-related

credit transactions, in making available or denying a dwelling, and in the terms, conditions, or privileges of sale of a dwelling or the provision of services in connection with such a sale, on the basis of race, color, national origin, and other characteristics.  42 U.S.C. §§ 3604(a)–(b), 3605(a). Under ECOA and its implementing regulation, Regulation B, 12 C.F.R. pt. 1002, it is unlawful for a creditor to discriminate against an applicant in any aspect of a credit transaction on the basis of race, color, national origin, and other characteristics.  15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(a). ECOA and Regulation B also prohibit any statements, acts, or practices that would or could discourage on a prohibited basis an applicant or prospective applicant from applying for credit.  15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(b); 12 C.F.R. pt. 1002, Supp. I, ¶ 1002.4(b)(1).

3.    "Redlining" is one type of discrimination prohibited under the FHA, ECOA, and Regulation B.  Redlining occurs when lenders deny or discourage applications or avoid providing loans and other credit services in neighborhoods based on the race, color, or national origin of the residents of those neighborhoods.

4.    From 2014 through 2018 (the "Relevant Time Period"), Trustmark National Bank engaged in a pattern or practice of unlawful redlining.  As alleged in detail herein, Trustmark avoided providing home loans and other mortgage services and discouraged applications for credit for properties located in majority-Black and Hispanic neighborhoods in the Memphis, Tennessee-Mississippi-Arkansas Metropolitan Statistical Area ("Memphis MSA").

5.    Trustmark's redlining practices included locating and maintaining nearly all its branch locations and mortgage loan officers in majority-white neighborhoods.  The locations of these branches were listed on Trustmark's website.  The Bank relied on mortgage loan officers concentrated in majority-white areas as the primary source for generating loan applications and conducting outreach, thereby essentially failing to market and advertise in majority-Black and Hispanic areas.  Further, the Bank maintained inadequate internal fair-lending policies and

procedures to ensure that the Bank was positioned to provide equal access to credit to majority-Black and Hispanic neighborhoods.  As a result of these practices, the Bank generated disproportionately low numbers of loan applications and home loans from majority-Black and Hispanic neighborhoods in the Memphis MSA compared to similarly-situated lenders.

6.     Trustmark's conduct and practices were intended to deny, and had the effect of denying those residing or seeking credit for properties located in majority-Black and Hispanic neighborhoods equal access to home loans and otherwise discouraged such individuals from applying for home loans.  The Bank's conduct was not justified by a business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action.  The action arises under federal laws, 12 U.S.C. § 5565(a)(1), 42 U.S.C. § 3614(a), 15 U.S.C. § 1691e(h); it presents a federal question, 28 U.S.C. § 1331; and the United States and an agency of the United States bring this action as plaintiffs, 28 U.S.C. § 1345.

8.     Venue is proper in this Court under 28 U.S.C. § 1391 and 12 U.S.C. § 5564(f), and venue is proper in this division, because Trustmark conducts business in, and a substantial part of the events or omissions giving rise to the claims occurred in, this judicial district and division.

## PARTIES

9.     The United States brings this action to enforce the provisions of the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA.  42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h).  The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance.

42 U.S.C. § 3614(a).

10.     The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under federal consumer financial laws.  12 U.S.C. § 5491(a).  The Bureau has independent litigating authority to enforce federal consumer financial laws, 12 U.S.C. § 5564(a), including ECOA.  12 U.S.C. §§ 5481(12)(D), 5481(14).

11.     Defendant Trustmark National Bank is a national bank headquartered in Jackson, Mississippi that offers commercial, consumer, mortgage, and wealth management banking services.  The Bank currently operates 196 branches throughout Mississippi, Tennessee, Alabama, Texas, and Florida, including 22 branches in the Memphis MSA.  As of December 31, 2020, Trustmark's total assets equaled $16.550 billion.  From 2014 to 2019, the Memphis MSA was consistently in Trustmark's top three markets for home mortgage lending.

12.     Trustmark is subject to the regulatory authority of the Office of the Comptroller of the Currency ("OCC").  Because its assets exceed $10 billion, Trustmark is also subject to the Bureau's authority, including enforcement authority.  12 U.S.C. § 5515(c).

13.     Trustmark is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100, and Regulation B.

14.     Trustmark is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and is an entity whose business includes engaging in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

## FACTUAL ALLEGATIONS

### The Memphis MSA and Trustmark's Assessment Area

15.     During the Relevant Time Period, the Memphis MSA was comprised of nine counties in three states: Crittenden County in Arkansas; Benton, DeSoto, Marshall, Tate, and

Tunica Counties in Mississippi; and Fayette, Shelby, and Tipton Counties in Tennessee.

16.    The Memphis MSA has over 1.3 million residents.  According to data from the United States Census Bureau, in 2018, the region was 45.8 percent non-Hispanic Black ("Black"), 45.4 percent non-Hispanic white ("white"), and 5 percent Hispanic or Latino.  Almost 50 percent of census tracts in the Memphis MSA, or 158 tracts, are majority-Black and Hispanic.  As used in this Complaint, a "majority-Black and Hispanic" tract is one where more than 50 percent of the residents are identified as either "Black or African American" or "Hispanic or Latino" by the United States Census Bureau.  A "majority-white" tract is one where more than 50 percent of the residents are identified as "non-Hispanic white" by the United States Census Bureau.[1]

17.    Shelby County, Tennessee, where the city of Memphis is located, accounts for a disproportionate share of the Black and Hispanic populations in the Memphis MSA.  Shelby County has 221 census tracts, of which 138 tracts, or 62 percent, are majority-Black and Hispanic.

18.    As a depository bank, Trustmark is subject to the requirements of the Community Reinvestment Act ("CRA"), 12 U.S.C. §§ 2901–2908, and its enabling regulations, which require covered banks to meet the credit needs of the communities that they serve.  Each bank subject to the CRA self-identifies the communities that it serves in the bank's "assessment areas."  Federal regulators look at a bank's assessment area in evaluating whether an institution is meeting the credit needs of its entire community.

19.    Trustmark's self-designated assessment area consists of three contiguous counties where approximately 83 percent of the Memphis MSA's population resides: Shelby and Fayette Counties in Tennessee and DeSoto County in Mississippi.  The Bank's assessment area contains 90 percent of the majority-Black and Hispanic census tracts in the entire Memphis MSA.

---

[1] The complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably.  The complaint does the same for "majority-white tract," "majority-white area," and "majority-white neighborhood."

**Trustmark's Memphis MSA Branches Are Concentrated in Majority-White Neighborhoods**

20.     During the Relevant Time Period, Trustmark located its branches in the Memphis MSA so as to serve the credit needs of majority-white neighborhoods and avoid serving the credit needs of those residing in or seeking credit for properties located in majority-Black and Hispanic neighborhoods.

21.     During the Relevant Time Period, Trustmark operated between 22 and 25 branches in the Memphis MSA.  Eighteen of these branches were "full-service" branches, which offered the full suite of Trustmark's retail products and services, and at most 7 of these branches were "limited-service" branches, which offered only some products and services.  No "limited-service" branch accepted residential mortgage loan applications.

22.     Although 50% of the census tracts in the Memphis MSA are majority-Black and Hispanic, during the Relevant Time Period, the Bank maintained only 4 of its 25 total branches in majority-Black and Hispanic areas.  The remaining 21 branches were located in majority-white neighborhoods.  *See* Exhibit A.

23.     During the Relevant Time Period, 3 of the Bank's branches located in majority-Black and Hispanic neighborhoods were full-service branches.  Two of those 3 branches were established or acquired at a time when the surrounding neighborhoods were majority-white but are now located in majority-Black and Hispanic neighborhoods, due to population-shifting demographics rather than actions by the Bank to serve Black and Hispanic communities.

24.     During the Relevant Time Period, only 1 of the Bank's 7 limited-service branches was located in a majority-Black and Hispanic neighborhood in the Memphis MSA.  The Bank closed that limited-service branch in 2015.  Thus, from 2016 through 2018, the Bank operated no limited-service branch in a majority-Black and Hispanic neighborhood in the Memphis MSA.

25.     Trustmark first entered the Memphis MSA market in 1987, acquiring 4 branches in

DeSoto County, Mississippi, all located in majority-white areas.

26.     Trustmark expanded into Tennessee in 2001, acquiring additional branches in Shelby County, all located in majority-white areas.

27.     Since 2001 and through 2018, Trustmark established 4 "de novo" (created, instead of acquired) branches in the Memphis MSA.  Three of the 4 branches are located in majority-white areas.

28.     Trustmark knew its branches were not serving the credit needs of majority-Black and Hispanic areas but did not take steps to address this failure for years.

29.     By concentrating nearly all of its branches in majority-white neighborhoods, Trustmark discouraged residents of, or those seeking credit for properties located in, majority-Black and Hispanic neighborhoods from applying for and obtaining home loans and restricted their access to the Bank's credit and mortgage lending services.

**Trustmark Concentrated Mortgage Loan Officers and Services in Majority-White Neighborhoods While Neglecting the Mortgage Lending Needs of Majority-Black and Hispanic Neighborhoods**

30.     During the Relevant Time Period, Trustmark's mortgage loan officers served the credit needs of majority-white neighborhoods but did not serve the credit needs of majority-Black and Hispanic neighborhoods in the Memphis MSA, thus discouraging residents of, or those seeking credit for properties located in, majority-Black and Hispanic neighborhoods from applying for and obtaining home loans and restricting their access to the Bank's credit and mortgage lending services.

31.     During the Relevant Time Period, Trustmark maintained only 3 full-service branches in majority-Black and Hispanic census tracts; the other 15 full-service branches were located in majority-white census tracts.  During the Relevant Time Period, the Bank assigned all of its mortgage loan officers to its branches in majority-white areas; it did not assign a single mortgage

loan officer to any of Trustmark's branches located in majority-Black and Hispanic neighborhoods.

32.     In the majority-white neighborhoods in the Memphis MSA where mortgage loan officers were assigned branch offices, mortgage-lending services were available to walk-in customers.  These services were not available in the majority-Black and Hispanic neighborhoods where loan officers were not assigned branch offices.

33.     During the Relevant Time Period, Trustmark relied almost entirely on mortgage loan officers, all of whom were assigned offices in branches in majority-white neighborhoods, to develop referral sources, conduct outreach to potential customers, and distribute marketing materials related to the Bank's mortgage lending services.

34.     The Bank did not monitor or document where its mortgage loan officers developed referral sources or to whom loan officers distributed marketing or outreach materials related to mortgage lending services to ensure that such sources or distribution occurred in all neighborhoods throughout the Memphis MSA.

35.     The Bank took no meaningful steps to supplement the efforts of mortgage loan officers to generate mortgage loan applications from majority-Black and Hispanic areas in the Memphis MSA.

36.     The Bank's marketing strategy in the Memphis MSA was focused on developing commercial business, with an emphasis on "brand messaging," or generic advertising emphasizing Trustmark's "brand" as a reliable community institution offering an omnibus of products and services.  Accordingly, during the Relevant Time Period, the majority of the Bank's print or digital advertising appeared in business-focused publications, including Chamber of Commerce publications distributed primarily in majority-white neighborhoods, and did not regularly appear in media or platforms accessible to or targeted at majority-Black and Hispanic areas.

37.     Trustmark knew that its focus on commercial advertising and generic brand messaging was ineffective at generating mortgage loan applications from majority-Black and Hispanic areas in the Memphis MSA during the Relevant Time Period.

**Trustmark's Inadequate Internal Fair-Lending Monitoring**

38.     During the Relevant Time Period, the Bank's internal fair lending policies and procedures were inadequate to ensure that the Bank was positioned to provide equal access to credit to majority-Black and Hispanic neighborhoods in the Memphis MSA.

39.     Trustmark did not establish internal governance and oversight committees to oversee fair-lending efforts or determine if the Bank was generating loans in majority-Black and Hispanic neighborhoods until August 2018.

40.     Trustmark did not conduct a comprehensive internal fair-lending risk assessment until 2018.

41.     Trustmark did not incorporate fair lending considerations in its branching decisions or in the development of new loan products and services until 2018.

**Disproportionately Low Numbers of Home Loan Applications from Majority-Black and Hispanic Neighborhoods in the Memphis MSA**

42.     Trustmark's acts and lending policies and practices, including those alleged in Paragraphs 15 to 41, have discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods in the Memphis MSA from applying for and obtaining home loans and other mortgage-related services.

43.     Trustmark's own data on loan applications and originations that it is required to report to regulators under the Home Mortgage Disclosure Act of 1975 ("HMDA"), 12 U.S.C. §§ 2801–2811, confirms that Trustmark has avoided serving majority-Black and Hispanic neighborhoods in the Memphis MSA.  *See* Exhibit B (depicting Trustmark's applications from majority-Black and Hispanic tracts in the Memphis MSA in 2014 and 2018).

44.     During the Relevant Time Period, Trustmark Bank significantly underperformed its "peer lenders" in generating home mortgage loan applications from majority-Black and Hispanic areas in the Memphis MSA.  "Peer lenders" are similarly-situated financial institutions that received between 50 percent and 200 percent of the Bank's annual volume of home mortgage loan applications.

45.     The disparity between the rate of applications generated by Trustmark and the rate generated by its peer lenders from majority-Black and Hispanic areas is both statistically significant – meaning unlikely to be caused by chance – and sizable across the five-year Relevant Time Period.

46.     During the Relevant Time Period, Trustmark received 3,064 HMDA-reportable mortgage loan applications within the Memphis MSA.  Of those applications, 10 percent came from individuals seeking credit for properties located in majority-Black and Hispanic census tracts. By contrast, during the same time period, Trustmark's peers generated 24 percent of their 68,204 total applications from individuals seeking credit for properties located in these same majority-Black and Hispanic census tracts.

47.     In other words, Trustmark's peers generated applications from individuals seeking credit for properties located in majority-Black and Hispanic census tracts at almost 2.5 times the rate of Trustmark.  When disparities were calculated for individual years, Trustmark's peers generated applications at a rate between 1.85 and 3.68 times the rate of Trustmark.  These disparities are statistically significant – meaning, unlikely to have been produced by chance – across the five-year Relevant Time Period and in every year analyzed.

48.     The statistically significant disparities between applications Trustmark generated from majority-Black and Hispanic neighborhoods and those that its peers generated show that there were individuals seeking credit for properties located in majority-Black and Hispanic areas in the

Memphis MSA.   Trustmark had no legitimate, non-discriminatory reason to draw so few applications from these areas.

49.     These figures show a statistically significant failure by Trustmark, relative to its peer lenders, to draw applications for home loans and provide residential mortgage services to residents of, and those seeking credit for properties located in, majority-Black and Hispanic census tracts in the Memphis MSA on a non-discriminatory basis during the Relevant Time Period.

**Disproportionately Low Number of Mortgage Loans Made in Majority-Black and Hispanic Neighborhoods of the Memphis MSA**

50.     Trustmark's acts and lending policies and practices, including those alleged in Paragraphs 15 to 41, have discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods from applying for and obtaining home loans and other mortgage-related services.   As a result, the Bank made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers from 2014 through 2018.   *See* Exhibit C (depicting Trustmark's loan originations from majority-Black and Hispanic tracts in the Memphis MSA in 2014 and 2018).

51.     From 2014 to 2018, Trustmark made 2,369 HMDA-reportable residential mortgage loans in the Memphis MSA.   Of those loans, 8.3 percent were made to residents of majority-Black and Hispanic census tracts.   By contrast, Trustmark's peers made 42,714 HMDA-reportable residential mortgage loans in the same area, of which about 19 percent went to residents of majority-Black and Hispanic census tracts – more than double the rate of Trustmark.

52.     When disparities were calculated for individual years, Trustmark's peers made loans at a rate between 1.65 and 3.35 times the rate of Trustmark.   The disparities are statistically significant across the five-year Relevant Time Period and for each individual year from 2014 to 2018.

53.     The statistically significant disparities between the number of home loans Trustmark

made from majority-Black and Hispanic neighborhoods and those that its peers made show that there were individuals seeking and qualified for credit for properties located in majority-Black and Hispanic areas in the Memphis MSA. Trustmark had no legitimate, non-discriminatory reason to make so few home loans from these areas.

54.     These figures show a statistically significant failure by Trustmark, relative to its peer lenders, to make home loans and provide residential mortgage services to residents of, and those seeking credit for properties located in, majority-Black and Hispanic census tracts in the Memphis MSA on a non-discriminatory basis during the Relevant Time Period..

### OCC's Referral and the United States' Investigation

55.     In February 2018, Trustmark's prudential regulator, the OCC, initiated a fair lending examination of Trustmark focused on redlining.

56.     After completing its examination and statistical analyses, the OCC determined that it had information suggesting that, between 2014 and 2016, Trustmark structured its mortgage operations in the Memphis MSA to avoid providing equal access to credit to residents seeking mortgage loans in majority-minority areas and thereby engaged in a pattern or practice of discrimination in violation of the FHA.

57.     By correspondence dated April 6, 2020, the OCC notified the United States Department of Justice and the Bureau of this matter.

58.     On June 9, 2020, the United States notified Trustmark that it was opening an investigation into whether the Bank had engaged in unlawful redlining in violation of the FHA and ECOA and requested documents related to Trustmark's lending practices for the time period January 1, 2014, to the present.

59.     Trustmark's discriminatory practices as described herein were intended to discriminate and have had the effect of discriminating on the basis of race, color, and national

origin.

## COUNT I – VIOLATION OF THE FAIR HOUSING ACT
### (By the United States of America)

60.    The United States incorporates all prior paragraphs of the Complaint as if fully set

forth herein.

61.    Trustmark's policies and practices constitute the unlawful redlining of majority-

Black and Hispanic communities in the Memphis MSA on account of the racial and national origin

composition of those communities.  Trustmark's policies and practices were intended to deny, and

had the effect of denying, equal access to home loans to residents of majority-Black and Hispanic

communities and those seeking credit for properties located in those communities.  The Bank's

conduct was not justified by a business necessity or legitimate business considerations.

62.    Trustmark's actions as alleged herein constitute:

a.    Discrimination on the basis of race, color, and national origin in making

available residential real estate-related transactions, or in the terms or

conditions of residential real estate-related transactions, in violation of the

Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulations,

24 C.F.R. §§ 100.110(b), 100.120;

b.    The making unavailable or denial of dwellings to persons because of race,

color, and national origin, in violation of the Fair Housing Act, 42 U.S.C.

§ 3604(a), and its implementing regulations, 24 C.F.R. § 100.50(b)(3);

c.    Discrimination on the basis of race, color, and national origin in the terms,

conditions, or privileges of the sale or rental of dwellings, or the provision

of services or facilities in connection with the sale or rental of dwellings, in

violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its

implementing regulations, 24 C.F.R. §§ 100.50(b)(2), 100.65.

63.     Trustmark's policies and practices as alleged herein constitute:

    a.     A pattern or practice of resistance to the full enjoyment of rights secured by the FHA; and

    b.     A denial of rights granted by the FHA to a group of persons that raises an issue of general importance.

64.     Trustmark's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

65.     Persons who have been victims of Trustmark's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of the Bank's conduct in violation of the Fair Housing Act, as described above.

**COUNT II –VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**
**(By the United States of America and the Consumer Financial Protection Bureau)**

66.     The United States and the Bureau incorporate all prior paragraphs of the Complaint as if fully set forth herein.

67.     Trustmark's policies and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and Hispanic communities in the Memphis MSA and engaging in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit on the basis of race, color, and national origin in violation of ECOA and Regulation B.  15 U.S.C. § 1691 *et seq*.; 12 C.F.R. § 1002.4(a)–(b).

68.     Trustmark's policies and practices as alleged herein constitute a pattern or practice of discrimination and discouragement and resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, 15 U.S.C. § 1691e(h).

69.     Trustmark's pattern or practice of discrimination was intentional and willful and was

14

implemented with reckless disregard for the rights of individuals based on their race, color, and national origin.

70.     Persons who have been victims of Trustmark's discriminatory policies and practices are "aggrieved" as defined in 15 U.S.C. § 1691e(i), and may have suffered damages as a result of the Bank's conduct in violation of the Equal Credit Opportunity Act, as described above.

## COUNT III – VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT
### (By the Consumer Financial Protection Bureau)

71.     The Bureau incorporates all prior paragraphs of the Complaint as if fully set forth herein.

72.     Section 1036(a)(1)(A) of the Consumer Financial Protection Act prohibits a covered person from offering or providing to a consumer any financial product or service not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

73.     The Equal Credit Opportunity Act is a federal consumer financial law. 12 U.S.C. §§ 5481(12)(D), 5481(14).

74.     Trustmark's violations of the Equal Credit Opportunity Act, described above in Count II, constitute a violation of Section 1036(a)(1)(A) of the Consumer Financial Protection Act. 12 U.S.C. § 5536(a)(1)(A); 15 U.S.C. § 1691c(b).

## REQUEST FOR RELIEF

WHEREFORE, the United States and the Bureau pray that the Court enter an order that:

(1)     Declares that the conduct of Defendant Trustmark National Bank violates the Fair Housing Act;

(2)     Declares that the conduct of Defendant Trustmark National Bank violates the Equal Credit Opportunity Act;

(3)     Enjoins Defendant, its officers, agents, servants, employees, assignees, and

15

successors in interest, and all other persons in active concert or participation with Defendant, from:

A.   Discriminating on account of race, color, or national origin in any aspect of their lending business practices;

B.   Discouraging applicants or prospective applicants on account of race, color, or national origin;

C.   Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Defendant's unlawful practices to the position they would be in but for the discriminatory conduct;

D.   Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendant's unlawful practices, and providing policies and procedures to ensure all segments of Defendant's market areas are served without regard to prohibited characteristics;

(4)   Awards monetary damages against Defendant in accordance with 42 U.S.C. § 3614(d)(1)(B); 15 U.S.C. §§ 1691c(a)(9), 1691e(h); and 12 U.S.C. § 5565(c).

(5)   Assesses a civil money penalty against Defendant in an amount authorized by 12 U.S.C. § 5565(c) and 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6)   Awards the United States and the Bureau any additional relief the interests of justice may require.

**DEMAND FOR JURY TRIAL**

The United States and the Bureau demand trial by jury in this action on all issues so triable.


Dated: October 22, 2021                          Respectfully submitted,


JOSEPH C. MURPHY, JR.                    KRISTEN CLARKE
Acting United States Attorney             Assistant Attorney General
Western District of Tennessee             Civil Rights Division

                                          SAMEENA SHINA MAJEED
                                          Chief

                                          JON M. SEWARD
                                          Principal Deputy Chief

                                          */s/ Marta Campos*
*/s/ Eileen Kuo*                          */s/ Samantha Ondrade*
EILEEN KUO (TN Bar No. 027365)            MARTA CAMPOS (pro hac vice application
Assistant United States Attorney          pending)
United States Attorney's Office           SAMANTHA ONDRADE (pro hac vice
Western District of Tennessee             application pending)
167 North Main Street, Suite 800          Trial Attorneys
Memphis, TN 38103                         Housing & Civil Enforcement Section
Phone: (901) 544-4231                     950 Pennsylvania Ave. NW – 4CON
Fax: (901) 544-4230                       Washington, DC 20530
Eileen.Kuo@usdoj.gov                      Phone: (202) 514-4713
                                          Fax: (202) 514-1116
                                          Marta.Campos@usdoj.gov
                                          Samantha.Ondrade@usdoj.gov

                                          CARA PETERSEN
                                          Acting Enforcement Director

                                          DAVID RUBENSTEIN
                                          Deputy Enforcement Director

                                          CYNTHIA GOOEN LESSER
                                          Assistant Deputy Enforcement Director

                                          */s/ Jonathan Reischl*
                                          JONATHAN REISCHL (pro hac vice
                                          application pending)
                                          JEFFREY BLUMBERG (pro hac vice

application pending)
NICHOLAS LEE (pro hac vice application pending)
BENJAMIN HAZELKORN (pro hac vice application pending)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Phone: (202) 435-9202
jonathan.reischl@cfpb.gov
jeffrey.blumberg@cfpb.gov
nicholas.lee@cfpb.gov
benjamin.hazelkorn@cfpb.gov